UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Hammond, Kennedy, Whitney & Company, Inc., | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| Freudenberg North America Limited Partnership, | ) | |
| | ) | |
| Defendant. | ) | |

## **VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, Hammond, Kennedy, Whitney & Company, Inc. ("Plaintiff"), for itself and as the duly appointed agent of the Sellers (as defined below), through its counsel, Taft Stettinius & Hollister LLP, for its Complaint, pursuant to 28 U.S.C. § 2201, against Defendant, Freudenberg North America Limited Partnership ("Defendant"), alleges as follows:

1.     This is an action for declaratory judgment and injunctive relief in connection with a dispute arising out of the Purchase Agreement (as defined below).

2.     Specifically, this action seeks a declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201, that (1) the Defendant must obtain a final, non-appealable judgment from a court of competent jurisdiction that the Sellers committed Actual Fraud (as defined in such Stock Purchase Agreement) before Defendant can proceed with arbitration to recover damages therefor; (2) there was no "Actual Fraud" at all; and (3) Defendant cannot assert any claims based on any extra-contractual representations, pursuant to the terms of the Purchase Agreement. Additionally, the arbitration of this dispute must be enjoined unless and until there is a final and non-appealable order finding of Actual Fraud.

1

## II.    THE PARTIES, JURISDICTION, AND VENUE

3.    Plaintiff is a New York corporation with its principal place of business located in Indianapolis, Indiana, and is a party to this action for itself and in its capacity as the duly appointed agent of Sellers.

4.    Defendant is a Delaware limited partnership with its principal place of business located in Plymouth, Michigan. Upon information and belief, the partners of Defendant are Externa Handels-und Beteiligungsgesellschaft mit beschränkter Haftung, a German limited liability company with its principal place of business in Weinheim, Germany, and Intpacor, Inc., a Delaware corporation with its principal place of business in Plymouth, Michigan. Upon information and belief, the sole member of Externa Handels-und Beteilingungsgesellschaft mit beshrankter Haftung is Freudenberg SE, a European corporation with its principal place of business in Weinheim. Germany.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) as this Court has personal jurisdiction over Defendant because the parties agreed to the jurisdiction of this Court in the Stock Purchase Agreement, which provided that any suit, action, or proceeding for which this Court has subject matter jurisdiction must be brought in this Court.

6.    Subject matter jurisdiction in this Court is founded upon diversity of citizenship pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity among the parties—Plaintiff is a citizen of New York and Indiana, and Defendant is a citizen of Michigan, Delaware, and Germany. 28 U.S.C. § 1332(c)(1).

## III.    BACKGROUND

### A.    The Acquisition

7.      PPA Holdings, Inc., an Indiana corporation ("Protect Plus"), through certain of its direct and indirect subsidiaries (Protect Plus and such subsidiaries, collectively, the "Companies") are, and at all relevant times have been, engaged in the business of manufacturing, selling and distributing air filtration products.

8.      On August 12, 2021, the shareholders of Protect Plus (collectively, the "Sellers"), Plaintiff and Defendant entered into a Stock Purchase Agreement (the "Purchase Agreement") pursuant to which, among other things, Defendant agreed to purchase and acquire all the issued and outstanding equity securities of Protect Plus from the Sellers, and the Sellers elected and appointed Plaintiff as their agent and representative to manage and resolve certain disputes arising out of or in connection with the Purchase Agreement.  (A copy of the Purchase Agreement is attached hereto as Exhibit A.)

9.      The Sellers and Defendant consummated the transactions contemplated by the Purchase Agreement (the "Acquisition") on September 21, 2021 at which time Defendant became the sole shareholder of Protect Plus.  As a result of the Acquisition, Defendant directly, or indirectly, owns all of the issued and equity securities of the Companies.

## B.      Defendant's Due Diligence Investigation

10.     In connection with the Acquisition and prior to its execution and delivery of the Purchase Agreement, Defendant undertook a comprehensive, business, financial, accounting and legal due diligence investigation of the Companies, their business, operations, financial condition and prospects.

11.     Defendant engaged several professional advisors to assist it in completing such due diligence investigation, including Bodman PLC (legal) and Rödl & Partner (accounting), among others.

3

12.     Defendant and its advisors, among other things, (a) met with members of the Companies' management team and asked questions of them concerning the Companies, their business, operations, financial condition and prospects, (b) delivered written due diligence requests for information to the Companies and their advisors, (c) reviewed and evaluated responses to such requests, along with other information made available by the Companies to Defendant and its advisors by way of an electronic, online data site, (d) reviewed and evaluated a Confidential Information Presentation prepared by the Company's investment banking firm, and (e) conducted interviews of certain of the Companies' material customers.

13.     Defendant conducted specific and targeted due diligence concerning the Companies' relationship, and their prospects for continuing their historical relationship, with The Home Depot ("Home Depot"), the Companies' largest customer.

14.     As part of that specific and targeted due diligence investigation, representatives of Defendant had unrestricted and unsupervised access to Home Depot personnel for the purpose of due diligence phone calls, and Defendant's representatives interviewed representatives of Home Depot regarding the historic relationship between the Companies and Home Depot and the prospects for that relationship continuing in the future.

## C.     Representations and Warranties

15.     To further investigate the Companies, their businesses, financial condition and prospects, Defendant caused the Companies to make certain representations and warranties in the Purchase Agreement.  Those representations and warranties are set forth in Article V of the Purchase Agreement (the "Company Representations").  The Company Representations include representations and warranties respecting the Companies' material customers, including Home Depot.

74582333v1

16.     The Company Representations expired and terminated at the closing of the Acquisition. (Purchase Agreement §7.02(b).)

## IV.    DEFENDANT'S ALLEGATIONS

17.     On June 22, 2022, Defendant notified Plaintiff in writing that, subsequent to the closing of the Acquisition, Home Depot either terminated or substantially reduced its relationship with the Companies.  In that notice, Defendant alleges that the Sellers committed "Actual Fraud" (as defined in the Purchase Agreement) in connection with the making of the Company Representations and otherwise in connection with the consummation of the Acquisition. Specifically, Defendant alleges that (a) Plaintiff and certain other individuals were aware that Home Depot was dissatisfied with its relationship with the Companies and that such relationship was vulnerable, (b) the Sellers failed to disclose this information to Defendant, (c) the Sellers made intentionally misleading statements about the Companies' relationship with Home Depot to Defendants, and (d) that the foregoing constitutes Actual Fraud.  (A copy of the letter pursuant to which Defendant asserted its claims against Sellers is attached as Exhibit B (the "Claim Notice").)

18.     The Claim Notice asserts claims relating to two specific allegations. First, Defendant claims that "Actual Fraud was committed in connection with . . . breaches of representations and warranties . . ." (Claim Notice at 1.)  Second, Defendant claims that certain individuals "failed to disclose and misrepresented material information" to Defendant in connection with the Acquisition.

19.     Thus, Defendant purports to have claims for Actual Fraud in connection with certain Company Representations and for fraud outside of the Purchase Agreement but in connection with the Acquisition.

5

20.     Defendant has also delivered a written notice to the insurer that provided the policy of representations and warranties insurance Defendant purchased at the closing of the Acquisition setting forth in detail the Company Representations that Defendant alleges were inaccurate or untrue.  (A copy of that written notice is attached hereto as Exhibit C (the "Insurance Claim").)

21.     Defendant claims in the Claim Notice and the Insurance Claim that there were breaches of certain of the representations and warranties made by Protect Plus in Sections 5.11(b)(xv), 5.11(b)(xvi), 5.22(c), and 5.26(a) of the Purchase Agreement, in that those representations and warranties were inaccurate or untrue when made.  Defendant contends it has incurred at least $16 million in damages as a result.

### A.     Section 5.11(b)(xv) of the Purchase Agreement

22.     Section 5.11(b)(xv) of the Purchase Agreement states in relevant part that "[s]ince the date of the Year-End Balance Sheet, except as described on Schedule 5.11 … there has not been any … acceleration, termination, modification (other than change orders received or given in the Ordinary Course), or cancellation of any Contract (or series of Contracts) involving more than $250,000."  (Claim Notice at 1.)

23.     Defendant alleges that such representation and warranty was inaccurate and untrue based on changes in Companies' fiberglass business, a supposed "price lock," and the issuance of certain gift cards.

### 1.     Changes in Fiberglass Business

24.     Defendant alleges that the Companies terminated their fiberglass filter business with Home Depot and that, as a result, Home Depot informed the Companies that it would no longer purchase fiberglass filters from the Companies.  Defendant alleges that this amounted to a

cancellation of a Contract (as defined in the Purchase Agreement) involving more than $250,000 and thus a breach of the foregoing representation. (Insurance Claim at 4–5, 10.)

25.     This allegation is false. The Companies did not terminate their filter business with Home Depot. Rather, the Companies reduced the number and variety of products they made available to Home Depot because of significant supply issues relating to the fiberglass required to manufacture such products, and because of losses incurred by the Companies in selling such products. This fact was disclosed to representatives of Defendant in connection with its due diligence investigation of the Companies and their relationship with Home Depot.

26.     There was no termination or modification of any contract in connection with the Companies' reduction of fiberglass products made available to Home Depot. Home Depot's Supplier Buying Agreements set forth the general terms and conditions of sales made by the Companies to Home Depot, but do not actually involve orders by Home Depot for products or the prices therefor. Rather, Home Depot ordered products from the Companies on a purchase order by purchase order basis, with each purchase order establishing the specific products ordered and the quantity and price thereof. Any reduction in Home Depot's purchase of fiberglass products from the Companies did not amend, modify or terminate any contract. Instead, the reduction would have been reflected in future purchase orders that were not Contracts (as defined in the Purchase Agreement) as of the date of the Purchase Agreement (and the date such representations and warranties were made).

**2.     "Price Lock"**

27.     Defendant also claims that the Companies modified their contracts with Home Depot by agreeing to a two-year price lock with Home Depot. Defendant alleges that such price-

7

lock agreement resulted in a breach of the representations and warranties set forth in Section 5.11(b)(xv) of the Purchase Agreement.  (Insurance Claim at 8, 10.)

28.     Specifically, Defendant claims that this alleged two-year price lock agreement modified the terms of the Companies' Home Depot contracts that permit periodic price modifications.  (Insurance Claim at 10.)

29.     Defendant's allegations are incorrect for several reasons.

30.     First, the Supplier Buying Agreements between the Companies and Home Depot apply only to price changes on *existing* purchase orders.  The alleged two-year price lock agreement, however, would have only applied to *future* purchase orders, not to *existing* purchase orders.  Thus, even if such price lock was agreed to, the price lock would not have altered Supplier Buying Agreements in any way.

31.     Second, the alleged two-year price lock would have occurred in June 2020.  Section 5.11(b)(xv) of the Purchase Agreement applies only to events occurring *after* the date of the Year-End Balance Sheet (as defined in the Purchase Agreement), which was December 31, 2020. Accordingly, the alleged two-year price lock did not occur during the period of time covered by Section 5.11(b)(xv) of the Purchase Agreement.

32.     Third, there was no actual agreement between the Companies and Home Depot concerning a two-year price lock.  The Companies and Home Depot *discussed* a two-year price lock, but were unable to agree on the conditions and scope of the price lock.  Because the parties never actually agreed to the price lock, it never became a part of any contract between the Companies and Home Depot and never resulted in any modification to any of their agreements.

**3.     Gift Cards**

74582333v1

33.     For its final allegation in support of its claim of a breach of the representations and warranties set forth in Section 5.11(b)(xv) of the Purchase Agreement, Defendant claims that the Companies were required to provide gift cards to certain of Home Depot's online customers because the Companies did not timely deliver certain products to such customers, and that such requirement constituted a modification to the Company's contracts with Home Depot.  (Insurance Claim at 8–9, 10–11.)

34.     The Companies were not *required* to provide gift cards to any Home Depot customers.  Rather, the Companies *voluntarily* agreed to provide $8,677 of gift cards to certain online customers of Home Depot in October 2020 as an accommodation for certain late deliveries.

35.     The Companies and Home Depot never *modified* their contracts to require the Company to provide these gift cards.

36.     Further, the gift cards were issued in 2020.  As noted above, Section 5.11(b)(xv) of the Purchase Agreement only applies to the time period *after* December 31, 2020.

**B.     Section 5.11(b)(xvi) of the Purchase Agreement**

37.     Section 5.11(b)(xvi) of the Purchase Agreement states, in relevant part, that "[s]ince the date of the Year-End Balance Sheet, except as described on Schedule 5.11 … there has not been any … change to the price for any products or services provided by the Company or any of its Subsidiaries to a Material Customer."

38.     Defendant claims that the representation and warranty set forth in Section 5.11(b)(xvi) of the Purchase Agreement was inaccurate or untrue based on the same supposed "price lock" and gift card allegations.

**1.     "Price Lock"**

39.     Defendant alleges that the proposed two-year price lock agreement constituted a change in the price for products of the Companies which violated the representation and warranty set forth in Section 5.11(b)(xvi) of the Purchase Agreement.  (Insurance Claim at 10.)

40.     As already stated above, however, no such price lock was ever agreed to by the Companies and Home Depot, and all discussions surrounding a price lock occurred in 2020, prior to the time period covered by Section 5.11(b)(xvi) of the Purchase Agreement.  Further, any such price-lock agreement, had one been agreed to, would not have changed any prices of any products sold by the Company to Home Depot.  Rather, it would have effectively set the prices for future purchase orders from Home Depot.

### 2.     Gift Cards

41.     Defendant also alleges that the Companies' voluntary offer to provide the aforementioned gift cards to certain online Home Depot customers constitutes a discount to the prices charged to such customers, thereby resulting a breach of the representation and warranty set forth in Section 5.11(b)(xvi) of the Purchase Agreement.  (Insurance Claim at 10–11.)

42.     As set forth above, the gift cards were issued prior to the period of time covered by Section 5.11(b)(xvi) of the Purchase Agreement and thus do not result in a breach of such representation and warranty.

43.     Further, the issuance of these gift cards did not result in a change in price in violation of such representation and warranty.  Rather, the products involved continued to carry the same price to all customers and the impacted customers still paid the same price to Home Depot (and Home Depot paid the same price to the Companies) for such products.

### C.     Section 5.22(c) of the Purchase Agreement

44.     Section 5.22(c) of the Purchase Agreement states, in relevant part, that

"Each Material Contract is in full force and effect and is valid and enforceable against the Company or one of its Subsidiaries (as appropriate) in accordance with its terms…. There are no renegotiations of, attempts to renegotiate or outstanding rights to renegotiate any material amounts paid or payable to or by the Company or any of its Subsidiaries under any Material Contract and no party thereto has made written demand for such renegotiation."

45.     Again, Defendant bases its claim that the representation and warranty set forth in Section 5.22(c) of the Purchase Agreement was inaccurate or untrue on the supposed "price lock" and gift card issues, as well as on claims related to rebates issued by the Companies.

## 1.     **<u>"Price Lock"</u>**

46.     Defendant claims that the aforementioned two-year price lock discussions represented a renegotiation of the material amounts paid or payable to the Companies under their contracts with Home Depot in violation of the representation and warranty set forth in Section 5.22(c) of the Purchase Agreement.  (Insurance Claim at 11.)

47.     Specifically, Defendant argues that such contracts allow periodic modifications to the Companies' pricing and that the alleged two-year price lock modified the Companies' ability to change pricing under their contracts with Home Depot.  (Insurance Claim at 11.)

48.     Defendant's allegation is incorrect for several reasons.

49.     First, as noted above, a two-year price lock was never agreed to by Home Depot and the Companies and thus never came into effect.

50.     Second, the discussions surrounding a price lock were not a renegotiation of any amounts paid or payable.  The price lock that was discussed would have only implicated future orders from Home Depot, and would not have impacted any amounts already "paid" by Home Depot.  Further, the price lock discussions did not relate to any amounts "payable" because, again, such a price lock would not have altered any existing purchase orders under which amounts were

payable by Home Depot.   The Supplier Buyer Agreements between Home Depot and the Companies contemplated potential price changes only on *existing* purchase orders.   The existing purchase orders would not have been affected by the price lock that was discussed by the parties.

51.     Third, the final sentence of Section 5.22(c) of the Purchase Agreement speaks only in the present tense (*i.e.*, "[t]here are no renegotiations of, attempts to renegotiate…").   The actions claimed by Defendant in support of its claim all occurred in the summer of 2020 and not at the time the representation and warranty was made.

**2.      Gift Cards**

52.     Defendant next claims that the Companies' offer of gift cards to certain online Home Depot customers constituted a renegotiation of the rights of the parties under the Companies' contracts with Home Depot.   (Insurance Claim at 11.)

53.     As discussed above, the offer of gift cards was a *voluntary* action of the Companies, not supported by consideration from Home Depot, and thus did not become a contract between the Companies and Home Depot.

54.     Further, the offer of gift cards did not implicate or alter any rights of any party under the contracts between the Companies and Home Depot.

55.     Finally, again, the final sentence of Section 5.22(c) of the Purchase Agreement speaks only in the present tense and the gift cards referenced by Defendants were discussed only in 2020 and not at the time of the closing of the Acquisition when such representation and warranty was made.

**3.      Rebates**

74582333v1

56.     Defendant's final claim in support of a breach of Section 5.22(c) of the Purchase Agreement alleges that Home Depot attempted to renegotiate its rebate agreement with the Companies by demanding rebates equaling approximately $700,000.  (Insurance Claim at 12.)

57.     In the fall of 2020, Home Depot informed the Companies that it believed the Companies underpaid agreed-upon rebates in 2019.   After investigation, the Companies determined that the rebates paid in 2019 were correct and that Home Depot misinterpreted the provisions of the rebate terms and conditions.

58.     The Companies informed Home Depot of their incorrect interpretation.  Home Depot ultimately agreed with the Companies' interpretation of the rebate agreement.

59.     Misinterpretation of a contract right is not an attempt to renegotiate a contract right and is therefore not a breach of the representation and warranty set forth in Section 5.22(c) of the Purchase Agreement.

60.     Also, as set forth above, the final sentence of Section 5.22(c) of the Purchase Agreement speaks only in the present tense and the conversation on the rebate agreement occurred wholly in 2020 and prior to the closing of the Acquisition when such representation and warranty was made.

**D.     Section 5.26(a) of the Purchase Agreement**

61.     Section 5.26(a) of the Purchase Agreement reads, in relevant part, as follows:

> In the last three (3) years, no Material Customer has: (i) terminated, or communicated in writing to the Company or any of its Subsidiaries its intention to terminate, its relationship with the Company or any of its Subsidiaries or (ii) reduced substantially, or communicated in writing to the Company or any of its Subsidiaries its intention to reduce substantially, the quantity of products or services it purchases from the Company or any of its Subsidiaries. Since the date of the Year-End Balance Sheet, no Material Customer has requested a price reduction or other material concession from the Company or any of its Subsidiaries.

13

62.     Defendant alleges that Home Depot threatened to terminate its business relationship with the Companies or reduce substantially the products it purchased from the Companies and that, accordingly, the foregoing representation and warranty was breached.  (Insurance Claim at 12.)

63.     To support this claim, Defendant disclosed to Plaintiff a series of internal emails from 2019 and 2020 surrounding the topic of price increases negotiated by the Companies and Home Depot.  In these emails, members of the Companies' sales team, and *not* Home Depot, expressed concern that such price increases could result in a loss of Home Depot business.

64.     Defendant has *not* produced or referenced *any* documents or evidence whatsoever that Home Depot ever threatened in writing to terminate or reduce substantially its business with the Companies.  In fact, the Companies' business with Home Depot continued at steady levels and even increased from 2019 to 2021.

65.     The fact that certain sales executives of the Companies were apprehensive about price increases with Home Depot does not demonstrate that Home Depot terminated or substantially reduced, or communicated in writing its intention to terminate or substantially reduce, its business with the Companies.

1.     **HDX Project**

66.     Defendant also claims that Home Depot abandoned a planned project whereby the Companies would manufacture private-labeled filters for Home Depot (the so-called HDX Project in the Insurance Claim) and that this, somehow, breached the foregoing representations and warranties.  (Insurance Claim at 12-13.)

67.     Notwithstanding this allegation, the HDX Project was not a "planned project" with the Companies, the abandonment of which resulted in a reduction of business.  Rather, Home Depot engaged in a bidding process under which multiple vendors were invited to submit proposals

14

for the HDX Project.  Ultimately, Home Depot awarded the HDX Project to a competitor of the Companies.

68.     Awarding an open-bid project to another vendor is not a "threat in writing" to terminate or reduce substantially a relationship with the Companies. The Companies never had this business.  Failure to win the award, therefore, could not result in a reduction of that business.

**2.     Gift Cards and Rebates**

69.     Defendant also alleges that the gift cards issued by the Companies, and Home Depot's mistaken request for approximately $700,000 in rebates, amounted to a price reduction and/or material concession by the Companies that was not disclosed in breach of Section 5.26(a) of the Purchase Agreement.  (Insurance Claim at 13.)

70.     This allegation is incorrect.  The last sentence of Section 5.26(a) of the Purchase Agreement states that this representation and warranty is applicable *only* to the period following the Year-End Balance Sheet (*i.e.*, after December 31, 2020).  As discussed above, each of these events occurred *prior* to December 31, 2020 and, therefore, are not the subject of this representation and warranty.

71.     Further, the gift cards issued by the Companies totaled $8,677, which amount is not material.

72.     Finally, the rebate request was an issue of mistaken interpretation of a contract right, not a concession or price reduction of any sort.

## V.     DEFENDANT'S REMEDIES

73.     The Purchase Agreement sets forth in detail the rights and remedies of the parties for breaches of representations and warranties, breaches of covenants and agreements and the

inaccuracy of statements made and information provided outside of the definitive agreement (*i.e.,* information provided during due diligence and not part of the Company Representations).

A.     <u>Remedy for Breaches of Representations and Warranties</u>

74.     As described above, the Company Representations terminated and expired at and as of the Closing (Purchase Agreement §7.02(b)). Defendant expressly agreed in the Purchase Agreement that, "[o]ther than for Actual Fraud, from and after the Closing, no Person (including [Defendant]) shall have any right to assert any claim . . . against . . . the Sellers . . . " for any breach of or inaccuracy in any Company Representation. (*Id.*) Rather, Defendant's "sole and exclusive remedy for any breach of or inaccuracy in" any Company Representation "shall be to assert a claim" under the policy of representations and warranties insurance purchased by Defendant at the Closing. (*Id.*) Any claim against the Sellers after the closing by Defendant for the breach of any Company Representation "may not be asserted . . . and shall be forever barred." (Purchase Agreement §7.03.)

75.     Thus, Defendant has no right to assert any claim against the Sellers other than for Actual Fraud as defined in the Purchase Agreement.

76.     Pursuant to Section 1.01 of the Purchase Agreement, Defendant can only bring a claim for Actual Fraud in the event that "a court of competent jurisdiction has determined pursuant to a final, written order from which no appeal has or can be taken" that (a) a Company Representation was untrue when made, (b) certain specifically identified individuals had "actual, conscious knowledge and awareness" that such Company Representation" was "untrue on the date it was made", (c) Defendant relied on the inaccuracy of that Company Representation in consummating the Acquisition, and (d) Defendant actually suffered injury because of its reliance.

77.    Defendant has not obtained from a court of competent jurisdiction a final, written order from which no appeal has been or can be taken making such a determination of Actual Fraud.

78.    The parties agreed that this Court is a court of competent jurisdiction to resolve the issue of whether Defendant has a valid claim for Actual Fraud. (Purchase Agreement §14.04(b).)

## B.    No Remedy for Inaccuracies in Extra-contractual Statements

79.    In addition to alleging that the Sellers' have committed Actual Fraud in connection with the making of certain Company Representations, Defendant alleges that the Sellers misrepresented the Companies' relationship with Home Depot to Defendants in verbal statements made by various individuals in connection with Defendant's due diligence investigation. Defendant claims that it relied on these statements in its decision to purchase the Companies and that it has been harmed thereby.

80.    These allegations, however, expressly contradict the agreements and acknowledgements made by Defendant in the Purchase Agreement.

81.    Specifically, Section 7.01 of the Purchase Agreement expressly provides that "no Person (including the Sellers . . .) has made, hereby makes, or shall hereafter make or be deemed to make . . . any representation or warranty, whether written or oral and whether express or implied, concerning or relating in any way to [the Companies], including as to the . . . prospects of the [Companies] . . . ." (*Id.*) Defendant further acknowledged that the Sellers made no representations or warranties "as to the accuracy or completeness of any information regarding the [Companies] furnished or made available to [Defendant], including" information set forth in the Companies' Confidential Information Presentation, "information, documents or material posted" to the electronic data site, or "any information, documents or material made available in any management

presentations, functional 'break-out' discussions or in response to questions or requests for information made by [Defendant]. (*Id.*)

82. Buyer agreed that no claims for any extra-contractual representations could be made against either the Sellers or the "Non-Recourse Parties," defined to include Plaintiff, its Affiliates, and all Representatives of each Seller. (Purchase Agreement §7.01 at 7.02, and p. 16.)

83. Buyer further agreed that in "entering into [the Purchase Agreement] and consummating the [Acquisition]" Defendant "relied exclusively on its own independent investigation of the [Companies]" and the Company Representations and "has not relied on any other representation or warranty of any other Person . . ." (Purchase Agreement §7.01(b); *see also* Purchase Agreement §6.07 ("In making its decision to enter into [the Purchase Agreement] and to consummate the transactions contemplated by [the Purchase Agreement], [Defendant] relied solely upon its own investigation and [the Company Representations].").)

84. Accordingly, Defendant cannot now claim that the Sellers made materially false representations and warranties outside of the Purchase Agreement relating to the Companies' relationship with Home Depot that it allegedly relied upon in deciding to consummate the Acquisition. Defendant has no right to assert a claim under the Purchase Agreement for the breach of or inaccuracy in any representation or warranty, or the inaccuracy in any information, not expressly included as a part of the Company Representations.

## VI. LITIGATION AND ARBITRATION OF DISPUTES

### A. Defendant's Demand for Arbitration

85. On August 9, 2022, counsel for Defendant, via email, notified counsel for Plaintiff of Defendant's intention to initiate arbitration to resolve its claims.

### B. Resolution of Disputes Under the Purchase Agreement

86.     In the Purchase Agreement, the parties agreed that certain disputes arising under the Purchase Agreement or in connection with the Acquisition must be resolved by binding arbitration and that others must be resolved by a court of competent jurisdiction. (*See* Purchase Agreement §§ 14.04 and 14.14 and the definition of Actual Fraud therein.)

87.     Pursuant to the Purchase Agreement "any dispute or disagreement between or among any of the parties as to the interpretation of any provision of this agreement, or any agreement incorporated herein, the performance of obligations hereunder or thereunder, or any other disputed matter relating hereto or thereto . . . shall be submitted to and settled exclusively by final and binding arbitration in lieu of a judicial proceeding . . ." (Purchase Agreement §14.04(a) and (b)).) Thus, as a general matter, disputes relating to the Purchase Agreement or the Acquisition may not be brought in court, but must be resolved by arbitration.

88.     Nevertheless, the parties agreed that certain claims must be resolved by a court of competent jurisdiction and are not subject to mandatory arbitration. Specifically, the Purchase Agreement provides that the provisions of the Purchase Agreement requiring mandatory arbitration shall not "preclude any party from seeking or obtaining from a court of competent jurisdiction . . . injunctive relief, or . . . equitable or other judicial relief to specifically enforce the provisions" of the Purchase Agreement. (Purchase Agreement §14.04(b).)

89.     Further, as indicated above, the parties agreed that a claim for Actual Fraud requires a finding by "a court of competent jurisdiction pursuant to a final, written order from which no appeal has or can be taken . . ." (Purchase Agreement §1.01.)

## COUNT I – INJUNCTION RESTRAINING ARBITRATION

90.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

91.     The parties have entered into the Purchase Agreement.

92.     Defendant alleges that Plaintiff and the Sellers committed Actual Fraud in connection with certain of the Company Representations.  (Claim Notice at 1.)

93.     The Purchase Agreement requires that allegations of Actual Fraud be determined by a court of competent jurisdiction.  (Purchase Agreement §1.01.)

94.     The parties have agreed that this Court is a court of competent jurisdiction. (Purchase Agreement §14.04(b).)

95.     Defendant has notified Plaintiff that it intends to commence arbitration immediately to determine whether Actual Fraud has occurred in connection with the making of certain of the Company Representations.

96.     No court of competent jurisdiction has determined that Actual Fraud occurred.

97.     Plaintiff has a reasonable likelihood of succeeding on its claims in this case.

98.     Plaintiff did not agree to arbitrate the determination of Actual Fraud, and arbitration of that question, which has been expressly reserved for litigation in this Court, would subject Plaintiff to irreparable harm that cannot adequately be remedied at law.

99.     The balance of equities weighs in favor of awarding an injunction. The determination of the question of whether Actual Fraud occurred is a mandatory prerequisite to arbitration, but will not preclude arbitration should a court of competent jurisdiction find Actual Fraud occurred. Defendant will not suffer harm by being required to delay arbitration of its claims pending that ruling, which is what is required by and was agreed upon in the Purchase Agreement.

100.    An injunction is in the public interest as it reflects the parties' agreement and is consistent with the freedom of contract.

101.    Plaintiff, for itself and as the duly appointed agent of Sellers, respectfully requests that this Court (a) enjoin Defendant from initiating and conducting arbitration of its claims of

breach of the Company Representations unless and until a final, non-appealable order has issued determining that there was Actual Fraud, and (b) grant and award it all other just and proper relief.

## COUNT II – DECLARATORY JUDGMENT THAT COURT MUST FIRST DETERMINE ACTUAL FRAUD BEFORE CLAIMS ARE RIPE FOR ARBITRATION

102.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

103.    The parties have entered into the Purchase Agreement.

104.    Defendant alleges that Plaintiff and the Sellers committed Actual Fraud in connection with the making of certain of the Company Representations.  (Claim Notice at 1.)

105.    The Purchase Agreement requires that allegations of Actual Fraud be determined by a court of competent jurisdiction in a final, non-appealable order, and that Actual Fraud is not subject to arbitration.  (Purchase Agreement §1.01.)

106.    Plaintiff did not agree to arbitrate the determination of Actual Fraud.

107.    Defendant has notified Plaintiff that it intends to commence arbitration immediately, and that it intends to allege in the arbitration that Actual Fraud has occurred in connection with the making of certain of the Company Representations.

108.    An actual and justiciable controversy exists as to whether a court's determination of Actual Fraud is a mandatory prerequisite before such a claim can be brought in an arbitration before. Because Defendant has not obtained such a determination, there is also an actual and justiciable controversy as to whether its claim is ripe for arbitration.

109.    Plaintiff, for itself and as the duly appointed agent of Sellers, respectfully requests that this Court (a) enter an Order declaring that a court of competent jurisdiction must determine whether there was Actual Fraud in a final, non-appealable order before Defendant can assert claims

21

of breach of certain of the Company Representations in an arbitration, and (b) grant and award it all other just and proper relief.

## COUNT III – DECLARATORY JUDGMENT THAT THERE IS NO "ACTUAL FRAUD"

110.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

111.    The parties have entered into the Purchase Agreement.

112.    Defendant alleges that Plaintiff and the Sellers committed Actual Fraud in connection with the making of certain of the Company Representations.  (Claim Notice at 1.)

113.    In order to prove Actual Fraud in connection with the making of any Company Representations, the Purchase Agreement requires that that Defendant obtain "a final, written order from which no appeal has or can be taken" from "a court of competent jurisdiction" that "(i) such representation or warranty was inaccurate or untrue when made . . .; (ii) the Company had Knowledge that such representation or warranty was inaccurate or untrue when so made; (iii) [Defendant] relied on the accuracy of such representation or warranty in entering into [the Purchase Agreement] and consummating the transaction contemplated [thereby]; and (iv) [Defendant] actually has suffered an injury in so relying on the accuracy of such representation or warranty." (Purchase Agreement §1.01.)

114.    Plaintiff disputes that there was Actual Fraud because Defendant cannot so demonstrate Actual Fraud has occurred. Accordingly, an actual and justiciable controversy exists as to whether Actual Fraud has occurred.

115.    As set forth above, Defendant must first demonstrate that one or more of the Company Representations was inaccurate or untrue as of the date such representations were made – August 12, 2021.

116.     Defendant claims in the Claim Notice and the Insurance Claim that there were breaches of the representations and warranties set forth in Sections 5.11(b)(xv), 5.11(b)(xvi), 5.22(c), and 5.26(a) of the Purchase Agreement, in that those representations and warranties were inaccurate or untrue when made.

<u>No Breach of Section 5.11(b)(xv) of the Purchase Agreement</u>

117.     There was no breach of the representations and warranties contained in Section 5.11(b)(xv) of the Purchase Agreement as a result of the Companies' reduction of fiberglass products made available to Home Depot or reduction in purchases of such products by Home Depot because that reduction was based on supply issues and losses incurred by the Companies, and the products purchased in each individual purchase order did not amend, modify, or terminate any contract.  Further, this reduction was fully discussed with and disclosed to Defendant and its representatives prior to the closing of the Acquisition.

118.     The representations and warranties set forth in Section 5.11(b)(xv) of the Purchase Agreement were not inaccurate or untrue when made as a result of the price-lock discussions between the Companies and Home Depot. Specifically, the proposed price lock would not have altered the Supplier Buying Agreements, discussions of the proposed price lock occurred prior to the period of time covered by 5.11(b)(xv) of the Purchase Agreement, and the proposed price lock was never actually agreed upon.

119.     There was no breach of the representations and warranties contained in Section 5.11(b)(xv) of the Purchase Agreement as a result of the gift cards issued by the Companies to Home Depot customers, which the Companies voluntarily agreed to provide as an accommodation and there was no related modification of any contracts. The gift cards were also issued prior to the period of time covered by 5.11(b)(xv) of the Purchase Agreement.

74582333v1

## No Breach of Section 5.11(b)(xvi) of the Purchase Agreement

120.    There was no breach of the representations and warranties contained in Section 5.11(b)(xvi) of the Purchase Agreement as a result of the proposed two-year price lock, which was never agreed upon and which was discussed prior to the time period covered by Section 5.11(b)(xvi).  Further, any such price-lock agreement, had one been agreed to, would not have changed any prices of any products sold by the Company to Home Depot.  Rather, it would have effectively set the prices for future purchase orders from Home Depot.

121.    There was no breach of the representations and warranties contained in Section 5.11(b)(xvi) of the Purchase Agreement as a result of the Companies' voluntary issuance of gift cards to certain online Home Depot customers. The gift cards were issued prior to the period of time covered by Section 5.11(b)(xvi) of the Purchase Agreement, and they did not result in a change in price in violation of such representation and warranty.  Rather, the products involved continued to carry the same price to all customers and the impacted customers still paid the same price to Home Depot (and Home Depot paid the same price to the Companies) for such products.

## No Breach of Section 5.22(c) of the Purchase Agreement

122.    There was no breach of the representations and warranties contained in Section 5.22(c) of the Purchase Agreement because discussions surrounding the proposed price lock, which never went into effect, were not a renegotiation of any amounts paid or payable.  The proposed price lock would have only implicated future orders from Home Depot, and would not have impacted any amounts already "paid" by Home Depot.  Further, the price lock discussions did not relate to any amounts "payable" because, again, such a price lock would not have altered any existing purchase orders under which amounts were payable by Home Depot.  The Supplier Buyer Agreements between Home Depot and the Companies contemplated potential price changes

only on *existing* purchase orders. The existing purchase orders would not have been affected by the proposed price lock.

123. There also was no breach of the representations and warranties contained in Section 5.22(c) of the Purchase Agreement based on the proposed price lock because the final sentence of that Section speaks only in the present tense (*i.e.*, "[t]here are no renegotiations of, attempts to renegotiate…), and the discussions of the proposed price lock occurred in the summer of 2020 and not at the time the representation and warranty was made.

124. There also was no breach of the representations and warranties contained in Section 5.22(c) of the Purchase Agreement as a result of the Companies' offer of gift cards to certain online Home Depot customers because the offer of gift cards was a *voluntary* action of the Companies, not supported by consideration from Home Depot, and thus did not become a contract between the Companies and Home Depot. The offer of gift cards did not implicate or alter any rights of any party under the contracts between the Companies and Home Depots. And the gift cards were discussed only in 2020, not at the time of the closing of the Acquisition when such representation and warranty was made.

125. There also was no breach of the representations and warranties contained in Section 5.22(c) of the Purchase Agreement as a result of Home Depot's attempt to renegotiate its rebate agreement with the Companies. Home Depot's position was based on a misinterpretation of the rebate terms and conditions. Misinterpretation of a contract right is not an attempt to renegotiate a contract right and is therefore not a breach of the representation and warranty set forth in Section 5.22(c) of the Purchase Agreement. And the rebates, like the gift cards, were discussed in 2020, prior to the closing of the Acquisition when such representation and warranty was made.

No Breach of Section 5.26(a) of the Purchase Agreement

25

126.     There was no breach of the representations and warranties contained in Section 5.26(a) of the Purchase Agreement, which are clear and unambiguous and do not include any representations about feelings of the Companies' management concerning price increases.

127.     Home Depot's award of the HDX Project is not a "threat in writing" to terminate or reduce substantially a relationship with the Companies. The Companies never had this business. Failure to win the award, therefore, could not result in a reduction of that business.  Accordingly, there was no breach of the representations and warranties contained in Section 5.26(a) of the Purchase Agreement because of the HDX Project being awarded to a competitor.

128.     There also was no breach of the representations and warranties contained in Section 5.26(a) of the Purchase Agreement as a result of the issuance of gift cards or rebates in 2020, or as a result of Home Depot's mistaken interpretation of the rebate provisions.

<u>There Was No "Knowledge" that Any Company Representations were Inaccurate or Untrue</u>

129.     As set forth above, in addition to proving that a representation and warranty was inaccurate or untrue when made (which, as set forth above cannot be proven), Defendant is required to prove that the "Company had Knowledge that such representation and warranty was inaccurate or untrue when so made . . ." (Purchase Agreement § 1.01.)

130.     To prove "Knowledge" (as defined in the Purchase Agreement), Defendant must prove that certain identified individuals "had actual, conscious knowledge and awareness that such representation and warranty was inaccurate or untrue on the date it was made . . ." (Purchase Agreement § 1.01.)

131.     Because there was no inaccuracy in any of the Company Representations, this cannot be demonstrated.

<u>Defendant Did Not Rely on Any Inaccuracy of a Company Representation</u>

74582333v1

132. As set forth above, to prove Actual Fraud, Defendant must also demonstrate that it "relied on the accuracy of such representation and warranty in entering into [the Purchase Agreement] and consummating the transaction contemplated [thereby] . . ." (Purchase Agreement § 1.01.)

133. The facts associated with the matters alleged by Defendant were fully disclosed or made available to Defendant and its representatives in connection with their due diligence investigation. Accordingly, Defendant was aware that the Company Representations were accurate and did not rely on any inaccuracy therein.

<u>Defendant Was Not Injured</u>

134. Finally, to prove Actual Fraud, Defendant must prove that it "actually suffered an injury in so relying on the accuracy of such representation and warranty." (Purchase Agreement § 1.01.)

135. Defendant was not injured by any inaccuracy in any Company Representation because there was no inaccuracy.

136. The Company Representations were true and correct when made. No Knowledge Party (as defined in the Purchase Agreement) had any actual knowledge to the contrary, Defendant did not rely on any inaccuracy in entering into the Purchase Agreement and closing the Acquisition, and Defendant was not injured in connection therewith.

137. Thus, Defendant cannot demonstrate Actual Fraud in connection with the making of the Company Representations, as that term is defined in the Purchase Agreement.

138. Plaintiff, for itself and as the duly appointed agent of Sellers, respectfully requests that this Court (a) enter an Order declaring that no Actual Fraud occurred in connection with any of the Company Representations, and (b) grant and award it all other just and proper relief.

74582333v1

## COUNT IV – DECLARATORY JUDGMENT THAT DEFENDANT CANNOT RAISE OTHER CLAIMS

139.    Plaintiff incorporates the foregoing paragraphs  as if fully set forth herein.

140.    In addition to asserting a claim for Actual Fraud in connection with the Company Representations, Defendant has asserted that the Sellers "and others, failed to disclose and misrepresented material information to [Defendant] . . . and make knowingly false and intentionally misleading statements designed to induce" Defendant to consummate the Acquisition.  (Claim Notice at 1, 2.)

141.    Upon information and belief, and although not adequately set forth in its Claim Notice for purposes of good faith negotiation, it appears this claim relates to information provided by the Companies to Defendant in connection with its due diligence investigation, including in management meetings and in response to due diligence requests.

142.    Defendant, however, expressly acknowledged and agreed that neither the Sellers nor any other person or entity made any representations and warranties as to the accuracy or completeness of any such information, and that Defendant did not rely on any such information in entering into the Purchase Agreement or completing the Acquisition.  (Purchase Agreement §§6.07 and 7.01.)

143.    Accordingly Defendant has waived its right to assert any claim for any extra-contractual failures or statements by the Sellers, or others, and only has the right to assert claims for Actual Fraud in connection with the Company Representations.  (Purchase Agreement §10.06.)

144.    Defendant has also expressly waived its right to assert any claim for any extra-contractual failures or statements by the Sellers, or others, against Sellers, Plaintiff or any of the other Non-Recourse Parties. (Purchase Agreement §§7.01 and 7.02.)

74582333v1

145.    An actual and justiciable controversy exists as to whether Defendant can assert any such claims against Plaintiff, because Defendant has notified Plaintiff that it intends to commence arbitration immediately, and that it intends to allege claims in the arbitration against Plaintiff and the Sellers that relate to such extra-contractual failures or statements.

146.    Plaintiff, for itself and as the duly appointed agent of Sellers, respectfully requests that this Court (a) enter an Order declaring that pursuant to the Purchase Agreement, Defendant cannot assert any claim for any failure to disclose information or for any inaccuracy in any information or statements provided by them, in connection with the Purchase Agreement or the Acquisition, other than for Actual Fraud in connection with the Company Representations, and (b) grant it all other just and proper relief.

WHEREFORE, Plaintiff Hammond, Kennedy, Whitney & Company, Inc., for itself and as the duly appointed agent of Sellers, respectfully requests that this Court (1) enter an Order enjoining Defendant from initiating and conducting arbitration of its claims of Actual Fraud in connection with the making of the Company Representations unless and until a final, non-appealable order from a court of competent jurisdiction has issued determining that there was Actual Fraud; (2) enter an Order declaring that a court of competent jurisdiction must determine whether there was Actual Fraud in a final, non-appealable order before Defendant can assert claims of breach of certain of the Company Representations in arbitration; (3) enter an Order declaring that no Actual Fraud occurred in connection with any of the Company Representations; (4) enter an Order declaring that pursuant to the Purchase Agreement, Defendant cannot assert any claim against Plaintiff, any of the Sellers, or any other Non-Recourse Party, for any failure to disclose information or for any inaccuracy in any information or statements provided by them, in connection with the Purchase Agreement or the Acquisition, other than for Actual Fraud in

connection with the Company Representations; (5) enter an Order awarding Plaintiff its attorneys' fees and costs, pursuant to Defendant's indemnification obligations in the Purchase Agreement or otherwise; and (5) grant to Plaintiff all other just and proper relief.

Respectfully submitted,

*/s/*  William J. Serritella, Jr.
William J. Serritella, Jr., #6210001 (IL)
Peter S. French (*pro hac vice* admission pending)
Ann O'Connor McCready, #6306662 (IL)
Paul J. Coogan, #6315276 (IL)
Taft Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
P: 317-713-3500
F: 317-713-3699
E:
wserritella@taftlaw.com
pfrench@taftlaw.com
amccready@taftlaw.com
pcoogan@taftlaw.com
*Attorneys for Plaintiff, Hammond, Kennedy,*
*Whitney & Company, Inc.*

74582333v1

## **VERIFICATION**

I, James C. Snyder, am a Partner at Hammond, Kennedy, Whitney & Company, Inc. and am authorized to make this verification for and on Plaintiff's behalf. I declare that I have read the Complaint and know the contents thereof. The matters and things set forth therein are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others, and I am relying in part upon their representations.

I declare under penalty of perjury that the aforesaid is true and correct.


Executed on August <u>18</u>, 2022

James C. Snyder
Partner
Hammond, Kennedy, Whitney & Company, Inc.

74582333v1